## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| CHARLES YOUNG, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.  3:15-CV-3742-M (BH) |
| | § | |
| NANCY A. BERRYHILL, ACTING, | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | Referred to U.S. Magistrate Judge |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Pursuant to *Special Order No. 3-251*, this case was automatically referred for issuance of findings, conclusions, and recommendation.  Before the Court is *Plaintiff's Opening Brief*, filed May 6, 2016 (doc. 22), *Defendant's Brief*, filed June 6, 2016 (doc. 23), and *Plaintiff's Reply Brief*, filed July 13, 2016 (doc. 26).   Based on the relevant findings, evidence, and applicable law, the Commissioner's decision should be **REVERSED**, and the case should be **REMANDED** for further administrative proceedings.

## I.   BACKGROUND[1]

### A.   Procedural History

Charles Dee Young, Jr. (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner)[2] denying his claim for supplemental security income (SSI) under Title XVI of the Social Security Act (Act).   On July 22, 2011, he applied for SSI, alleging disability beginning on July 16, 2011. (R. at 17, 231, 326-33.)  His claim was initially

---

[1]  The background information comes from the transcript of the administrative proceedings, which is designated as "R."

[2]  At the time of the initial filing of this appeal, Carolyn W. Colvin was the Acting Commissioner of the Social Security Administration, but she was succeeded by Nancy A. Berryhill beginning January 20, 2017.

denied on October 11, 2011, and upon reconsideration on December 28, 2011.  (R. at 234-37, 241-47.)  On January 13, 2012, he requested a hearing before an administrative law judge (ALJ). (R. at 248-50.)  He appeared and testified at a hearing on December 5, 2012.  (R. at 129-81.)

Following the hearing, the ALJ sent interrogatories to the examining consultative psychiatrist, Frank Crumley, M.D., on February 1, 2013.  (R. at 478.)  His responses were proffered to Plaintiff's attorney on March 13, 2013, and Plaintiff's attorney responded on March 19, 2013.  (R. at 488-89, 493-94.)  The ALJ asked Plaintiff's treating psychiatrist, Kazia Luszczynska, M.D., to answer additional questions on June 13, 2013, and she responded on June 26, 2013.  (R. at 524-26, 856-58.)   The ALJ set up a consultative examination with Barbara Fletcher, Psy.D., on September 3, 2013.  (R. at 906-16.)  The ALJ proffered Dr. Fletcher's consultative examination report to Plaintiff's attorney, (R. at 574), who requested a supplemental hearing with the opportunity to question Dr. Fletcher (R. at 578).  A supplemental hearing was held on March 28, 2014.  (R. at 182-215.)  Dr. Fletcher appeared and testified at the supplemental hearing.  (R. at 185-204.)

The ALJ denied Plaintiff's applications on May 30, 2014, finding him not disabled.  (R. at 17-27.)  Plaintiff timely appealed the ALJ's decision to the Appeals Council.  (R. at 12-13.)  The Appeals Council denied his request for review, and the ALJ's decision became the final decision of the Commissioner.  (R. at 1-4.)  Plaintiff timely appealed the Appeals Council's decision under 42 U.S.C. § 405(g).

**B.**   **Factual History**

**1.**   **Age, Education, and Work Experience**

Plaintiff was born on October 17, 1964, and was 49 years old at the time of the hearing on December 5, 2012.  (R. at 21, 134.)  He graduated from high school and previously worked as a

forklift operator.  (R. at 21.)

### 2.      Medical, Psychological, and Psychiatric Evidence

On March 27, 2009, Plaintiff met with Kazia Luszczynska, M.D., for a diagnostic interview exam at Dallas Metrocare Services (Metrocare).  (R. at 600.)  Plaintiff reported a history of alcohol and drug abuse, and multiple incarcerations.  (R. at 601.)  He also reported a fear of returning to prison and feelings of isolation.  (R. at 601.)  Dr. Luszczynska observed that Plaintiff was cooperative, adequately groomed, and had an organized thought process, but was also withdrawn, monotone, and reported paranoid delusions.  (R. at 602, 605.)  She diagnosed him with bipolar disorder, most recent episode mixed, severe with psychotic features; polysubstance dependence; and alcohol abuse.  (R. at 597, 600-03.)  Dr. Luszczynska prescribed Wellbutrin, Remeron, Cogentin, and Risperdal.  (R. at 602.)

Plaintiff attended group sessions at Metrocare on April 7 and April 9, 2009.  (R. at 608-09.) Employment Consultant II Brandon Blackstone reported that Plaintiff did well at both sessions and learned ways to reduce stress and improve his social interactions with others.  (R. at 608-09.) Plaintiff again met with Dr. Luszczynska at Metrocare on April 9, 2009.  (R. at 611-13.)  She noted that he partially responded to his medications but reported feeling over-sedated.  (R. at 612.)  Dr. Luszczynska increased Plaintiff's Risperdal dosage and decreased his Cogentin.  (*Id.*)  On June 19, 2009, Plaintiff had a scheduled visit with Dr. Luszczynska.  (R. at 640-42.)  Plaintiff reported continued mood swings and paranoia.  (R. at 641.)  Laboratory tests showed he was not a good candidate for Lithium to control his mood swings.  (*Id.*)  She increased Plaintiff's Risperdal dosage, but left his other medications unchanged.  (R. at 641-42.)

Plaintiff attended additional group sessions at Metrocare and individual psychosocial

rehabilitation through Metrocare from April 15, 2009 through August 4, 2009. (R. at 614-49.) It was reported that Plaintiff did well at most of his the group sessions. (*See* R. at 614, 620-21, 625-26, 630, 633-34, 638.)  Additionally, the notes from his psychosocial rehabilitation sessions reported that Plaintiff was actively engaged in learning coping skills and took steps to secure housing and his driver's license. (*See* R. at 623, 627-29, 631-32, 645.)  Plaintiff's assessment from August 4, 2009, reported that he appeared to be "coping well with his mental illness." (R. at 648.)

On September 9, 2009, Plaintiff saw Karla Lucas, APN, at Metrocare. (R. at 650-52.) She described Plaintiff as alert, cooperative, and goal-directed, but dysthymic, irritable, and "still paranoid." (R. at 651.)

On October 29, 2009, non-examining state agency medical consultant (SAMC) Margaret Meyer, M.D., completed a Psychiatric Review Technique questionnaire. (R. at 659-75.) Dr. Meyer opined Plaintiff had the severe impairments of bipolar disorder and antisocial personality disorder. (R. at 662, 665.) She further opined that his impairments did not meet or equal a listed impairment. (*See* R. at 662.)  Dr. Meyer noted that Plaintiff had mild limitations to his activities of daily living; moderate limitations to maintaining social functioning and concentration, persistence, and pace; and no episodes of decompensation. (R. at 669.)  In assessing Plaintiff's mental residual functional capacity (RFC), Dr. Meyer opined he had moderate limits in the ability to understand, remember, and carry out detailed instructions; moderate limits in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; moderate limits in the ability interact with the public; moderate limits in the ability accept instructions and respond to criticism from supervisors; and moderate limits in the ability to respond appropriately to changes in the work setting. (R. at 673-74.)  She then opined Plaintiff could understand, remember, and

carry out simple instructions, make simple decisions, concentrate for extended periods, interact with others, and respond to changes.  (R. at 675.)

Plaintiff met with Nurse Lucas at Metrocare again on January 8, 2010.  (R. at 743-45.)  Nurse Lucas reported that Plaintiff felt depressed, had a low self-worth because he did not have money to buy gifts for the holidays, and had severe hostility, an elevated mood, and anxiety.  (R. at 743.)  She observed Plaintiff's behavior as guarded with paranoid ideation, and he had a restricted affect.  (*Id.*) Nurse Lucas noted that Plaintiff knew his paranoid ideation was "irrational."  (*Id.*)  Because Plaintiff again reported a sedation effect from his medications, Nurse Lucas instructed him to reduce the Remeron to one pill a night.  (R. at 744.)  Plaintiff also continued with his pyschosocial rehabilitation on January 8, 2010.  (*See* R. at 746.)

When Plaintiff saw Dr. Luszczynska at Metrocare for a follow-up appointment on February 16, 2010, she observed that he was alert, oriented, and that his thoughts were organized.  (R. at 749.) He reported not hearing as many auditory hallucinations, but he became paranoid at night, only slept three hours a night, and felt "drugged."  (R. at 748.)  To address the sedation, Dr. Luszczynska reduced his Risperdal dosage, but added Zoloft and Trazodone at night. (R. at 749.)  When Plaintiff returned for another routine follow-up appointment on April 13, 2010, Dr. Luszczynska observed that Plaintiff was alert and oriented, and that his thoughts were organized.  (R. at 752-53.)  He reported some anxiety and continued sedation, but no auditory hallucinations or paranoia.  (R. at 752-54.)  During her mental status exam, Dr. Luszczynska noted Plaintiff was cooperative with no sign of psychosis, but his mood was dysthymic with a restricted affect.  (*Id.*)  Dr. Luszczynska reduced Plaintiff's Risperdal dosage and instructed him to take less Trazodone and to take it earlier, and she moved his Zoloft dose to night.  (R. at 753.)

Metrocare records note that Plaintiff was booked into jail for assault on August 9, 2010.  (R. at 759-60.)  On September 23, 2010 and November 2, 2010, Metrocare's jail liaison faxed his medication list and diagnosis to the Dallas County Jail/Parkland Jail Psychiatric Department (Parkland) for continuity of care.  (R. at 759-60.)  Records from Parkland show no mental health information received from Metrocare nor mental issues reported by Plaintiff.  (R. at 693-724.)

Following his release from jail, Plaintiff returned to Metrocare on July 21, 2011.  (R. at 762-64.)  Nurse Lucas observed that he was cooperative, alert, oriented, and his thoughts were organized.  (R. at 762.)  She also noted that Plaintiff complained of being easily agitated and having auditory hallucinations of sirens, social anxiety, claustrophobia, and anxiety attacks.  (R. at 763.)  Nurse Lucas resumed his previous medications.  (*Id.*)  Plaintiff consulted with Dr. Luszczynska on September 2, 2011, about increased voices and paranoia.  (R. at 796.)  Dr. Luszczynska changed the dosage of some of Plaintiff's medications.  (R. at 794.)

On September 20, 2011, Plaintiff had a psychiatric consultative examination with Frank E. Crumley, M.D.  (R. at 767-72.)  Dr. Crumley observed that Plaintiff was anxious and irritated but cooperative, and he talked non-stop about multiple things and the people who let him down.  (R. at 767.)  He noted that Plaintiff feared returning to jail.  (*Id.*)  During the direct mental status examination, Dr. Crumley observed that Plaintiff's thought processes were coherent, but reflected a mixture of logical and illogical, with tangents and frequent rapid repeats.  (R. at 769.)  Dr. Crumley also observed marked ideas of reference, and he described Plaintiff's mood as depressed with a mixture of irritation, labile, and tearful at times.  (*Id.*)  He also noted that Plaintiff was oriented, but estimated his intelligence as below average.  (R. at 770.)  Dr. Crumley diagnosed Plaintiff with a schizoaffective disorder, panic disorder, and generalized anxiety disorder.  (*Id.*)  He assessed a

6

global assessment of functioning of 35 and gave a guarded prognosis.  (R. at 771.)

On October 3, 2011, non-examining SAMC Richard Campa, Ph.D., completed a Psychiatric Review Technique questionnaire for Plaintiff.  (R. at 773-89.)  He opined that Plaintiff had the severe impairments of bipolar disorder, anxiety disorders, and substance addiction disorders.  (R. at 776, 778, 781.)  Dr. Campa noted that Plaintiff had mild limitations in his activities of daily living; moderate limitations in social functioning and maintaining concentration, persistence, and pace; and no episodes of decompensation.  (R. at 783.)  In assessing Plaintiff's mental RFC, Dr. Campa opined that he had marked limits in the ability to understand, remember, and carry out detailed instructions;  moderate limits in the ability to maintain attention and concentration for extended periods; moderate limits in the ability to perform activities within a schedule, maintain attendance, and be punctual; moderate limits working in coordination with or proximity to others; moderate limits in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; moderate limits in the ability to interact with the public; moderate limits in the ability to accept instructions and respond to criticism from supervisors; moderate limits in the ability to get along with coworkers; and moderate limits in the ability to respond appropriately to changes in the work setting. (R. at 787-88.) He opined that Plaintiff could understand, remember, and carry out simple instructions; make simple decisions; attend and concentrate for extended periods; interact with others; accept instructions; and respond to changes in a routine work setting.  (R. at 789.)  John Ferguson, Ph.D., reviewed Dr. Campa's findings on December 27, 2011, and affirmed his opinion.  (R. at 798-99.)

Plaintiff missed appointments at Metrocare on October 21, 2011 and January 4, 2012, but returned on February 20, 2012.  (R. at 797, 840, 845.)  Nurse Lucas noted that Plaintiff was

cooperative, oriented, and alert, and his thoughts were organized.  (R. at 840.)  She also noted that he likely had not taken his medication on a regular basis.  (R. at 841.)  She renewed his medications, except for the Wellbutrin.  (*Id.*)

On March 30, 2012, Plaintiff met with Kristen Grable, M.D., at Metrocare.  (R. at 836-38.) Plaintiff reported many of the same symptoms as before,  and Dr. Grable's mental status examination showed Plaintiff was depressed with a dysphoric affect.  (R. at 836, 837.)  Dr. Grable discontinued his Trazodone and started him on Benadryl.  (R. at 837.)

Plaintiff met with Sylvia Moring, M.D., at Metrocare on May 29, 2012.  (R. at 830-32.)  She observed that Plaintiff sat with his head down, and had psychomotor retardation and a dysphoric affect. (R. at 830-31.)  Dr. Moring continued Plaintiff's medications and added Trazodone.  (R. at 830.)

Plaintiff met with Charmeka Lipscomb, APN, on September 4, 2012.  (R. at 819.)  She observed that he was cooperative and oriented, but had a flat affect.  (*Id.*)  Plaintiff reported lack of sleep and sadness/anxiety due to his lack of a stable income.  (R. at 820.)  Nurse Lipscomb increased Plaintiff's Zoloft dosage.  (*Id.*)  She met with him again on December 12, 2012.  (R. at 896-99.)  He complained of drowsiness and Nurse Lipscomb observed a flat affect.  (*Id.*)  Plaintiff reported that the increased Zoloft did nothing for his anxiety, and he only slept three and one-half hours a night. (R. at 897.) Nurse Lipscomb prescribed Stelazine and increased his Trazodone dosage.  (*Id.*)

On February 14 and 18, 2013, Nurse Lipscomb and Dr. Luszczynska completed a Medical Assessment of Ability to Do Work-Related Activities (Mental).  (R. at 853-55.)  They opined that Plaintiff had a substantial loss of his ability to concentrate for extended periods; maintain attention for extended periods; perform at a consistent pace; act appropriately with the public; make simple

decisions; accept instructions and respond to criticism from supervisors; get along with coworkers; maintain personal appearance; behave in an emotionally stable manner; respond to changes in a routine work setting; cope with normal work stress; and finish a normal work week without interruptions from psychologically based symptoms. (*See* R. at 853-54.) They based their opinion on Plaintiff's diagnosed schizoaffective and substance use disorders. (R. at 854.) They further opined that even a minimal increase in mental demands would cause decompensation, and that Plaintiff would miss more than four days of work per month due to his impairment, symptoms, or treatment. (R. at 855.) Additionally, they noted that Plaintiff's limitations had been approximately the same since he began his treatment at Metrocare. (*Id.*)

 Plaintiff met with Nurse Lipscomb on February 14, 2013 and March 12, 2013. (R. at 890-93.) She discontinued his Stelazine and Benadryl dosages, and added Ativan. (R. at 890.) Nurse Lipscomb also continued the medications at Plaintiff's April 18, 2013 and June 18, 2013 appointments. (R. at 881-85.)

Plaintiff met with Barbara Fletcher, Psy.D., on September 3, 2013. (R. at 910-16.) He reported sleep disturbance, visual hallucinations, disappointment, and guilt, and he attributed his lack of cognitive functioning to years of drug use. (R. at 911.) He explained that he feared people who he had robbed and harmed in the past would come for him. (*Id.*) Dr. Fletcher observed that he was exceedingly guarded, mildly agitated, and mildly menacing. (R. at 910.) She also observed that he was uncooperative with the assessment and "mildly oppositional " during the assessment. (R. at 910, 912, 914.)

Dr. Fletcher described Plaintiff as depressed with an agitated affect, his thought process was circumstantial and exceedingly focused on past events, and he understood he had problems. (R. at

913.)  She conducted testing but deemed the results invalid due to Plaintiff's high level of agitation and poor cooperation level.  (R. at 914, 916.)  She provisionally diagnosed Plaintiff with major depression, anxiety disorder, antisocial personality disorder, and substance use disorder in remission.  (R. at 915.)  Dr. Fletcher found that Plaintiff might be suffering from multiple psychological problems, but it was not possible to adequately assess the nature of the disturbances given his presentation and the information available for her review.  (R. at 916.)

Plaintiff met with Nurse Lipscomb on September 17, 2013, and reported increased daytime auditory hallucinations, and Nurse Lipscomb increased his Risperdal dosage.  (R. at 944-46.)

### 3.  December 5, 2012 Hearing Testimony[3]

On December 5, 2012, Plaintiff, Charles Dee Young, Sr., Jacqueline K. Calhoun, Velma Floyd, and a vocational expert (VE) testified at a hearing before the ALJ. (R. at 129-81.)  Plaintiff was represented by an attorney. (R. at 131.)

#### a.  *Plaintiff's Testimony*

Plaintiff testified that he was born on October 17, 1964, and lived with his parents and sometimes his sister.  (R. at 134, 136.)  He graduated from high school and earned a high school diploma.  (R. at 135.)  Plaintiff did not work and was financially supported by his parents and his sister.  (R. at 134.)  He was single, divorced twice, and had two children aged 21 and 27 years old.  (R. at 135.)  He had a girlfriend who he visited two to three days a week, but he had no friends.  (R. at 136-37.)  He did not go shopping or to church with his girlfriend.  (R. at 137.)

Plaintiff testified that he was unable to work because he suffered from bipolar I and II, and was a manic schizophrenic.  (*Id.*)  He claimed to have two types of personalties but did not explain

---

[3]  Plaintiff had a hearing on August 5, 2010 relating to a prior application.  (*See* R. at 80-128.)  The transcript was included in the record, but it did not appear to have been considered in the ALJ's decision or the parties' briefing.

further.  (*Id.*)  He also "sometime[s]" thought someone was trying to kill him.  (*Id.*)  Plaintiff

received treatment and medication from Metrocare, which helped "[t]o an extent."  (*Id.*)  He testified

that the medication made him feel "medicated" and "nervous," however.  (R. at 138.)

Plaintiff also testified that he did not get along with his mother, which is why he lived

partially with his sister.  (R. at 140-41.)  Plaintiff's mother caused him to "shutdown" when she was

upset with him.  (R. at 140, 142.)  He sometimes attempted chores around his parents' house, but

he forgot things and did not finish them, so his parents no longer let him do them.  (R. at 136, 141-

42.)  For example, Plaintiff testified that he put clothes and laundry detergent in a washer, but forgot

to start the washer.  (*See* R. at 142-43.)

At the time of the hearing, Plaintiff was on probation for family violence and assault with

a deadly weapon, and on parole for a drug case.  (R. at 138-39.)  He testified that he complied with

the conditions of his release and did not use illegal drugs.  (R. at 139.)

### b.      Charles Dee Young, Sr.'s Testimony

Charles Dee Young, Sr. testified that he was Plaintiff's father, and that he saw him on a

regular basis.  (R. at 144-45.)  Plaintiff lived the majority of the time with his father and mother, but

also spent some time with his sister and girlfriend.  (R. at 145, 147.)

According to his father, Plaintiff could follow instructions when he was younger.  (*See* R.

at 154) (noting "[i]n the past, before all this come about . . . you could tell him go do something,

he'd do it").  Plaintiff's father testified that now his son's "mind just fades away," he stops tasks or

projects without finishing, and he begins something else.  (R. at 148.)  For example, when he washed

the car one day, Plaintiff stopped working; left soap on the car, the water running, a car door open,

and keys in the car; and walked to nearby park.  (R. at 148-49.)  His father testified that when

11

Plaintiff got to the park, he just sat down and "look[ed] up into space."  (R. at 149.)  In another instance, Plaintiff left water running in the tub while preparing to take a bath, which flooded the room.  (R. at 154-55.)

Plaintiff's father testified that his son had focused on taking his medicine since he had been released from jail a year and a half earlier.  (R. at 150.)  Since then, Plaintiff was also "reliable" about getting up and dressed in the morning, and he could bath and take care of his hygiene, keep himself and his room clean, and get ready for the next day.  (R. at 156-57.)  At times, Plaintiff was able to wash and put away dishes and wash the car without issue.  (R. at 157.)  At other times, Plaintiff would stop and fail to finish because he "forgot."  (*Id.*)

Plaintiff's father also testified that he should have sought mental health treatment for Plaintiff when he was younger.  (R. at 156.)  Plaintiff had not used illegal drugs or alcohol since his most recent release from prison.  (R. at 159.)  In response to a question from the ALJ, Plaintiff's father clarified that Plaintiff might have recently had a beer or two on one occasion.  (*See* R. at 160.)

### c.    *Jacqueline K. Calhoun's Testimony*

Jacqueline K. Calhoun testified that she was Plaintiff's sister and saw him on a daily basis.  (R. at 160.)  He stayed with her most weekends.  (R. at 161.)  Plaintiff brother was "totally different" from when he was younger.  (R. at 161-62.)  "He's in his own world," "[h]e forgets a lot," and its "just like talking to the wall."  (*Id.*)

She also testified that Plaintiff seemed better while on his medication.  (R. at 163.)  "He can follow task[s], kind of, completely. But he is mostly slow."  (*Id.*)  In response to a question about her meaning of "slow," Plaintiff's sister explained, "the medication, it makes . . . [him] relax . . . . He'll go to do what he got to do. But he's taking his own time."  (*Id.*)  Medication improved his

attitude.  (*Id.*)  Without his medication, however, Plaintiff was not cooperative.  (*Id.*)  She thought

that her brother could not keep a job because he would not follow directions.  (R. at 162.)

### d.   Velma Floyd's Testimony

Velma Floyd testified that she was Plaintiff's girlfriend, and that she had seen him every

other weekend for six months.  (R. at 165-66.)  Plaintiff was "like a little child."  (R. at 167.)  He

was unable to remember how to do certain things, such as measuring sugar for baking cookies or

emptying and disinfecting the tub when he was finished bathing.  (R. at 168-69.)

### e.   VE's Testimony

The VE testified that Plaintiff had past work as a forklift operator (921.683-050, medium,

SVP: 3).  (R. at 169.)

The ALJ asked the VE to consider a hypothetical person of Plaintiff's age with his education,

and work history.  (R. at 170.)  The hypothetical person had no exertional limitations, but due to

mental impairments, was limited to applying common sense understanding to carry out simple one

or two-step instructions.  (*Id.*)  The hypothetical person was able to deal with standardized situations

with occasional or no variables and had the mental capacity to perform work where interpersonal

contact was incidental to the work performed.  (*Id.*)  The ALJ clarified that by "incidental," he meant

that the individual would be working in the proximity of others, but the accomplishment of his tasks

were not dependant upon a close working relationship with the people around him.  (*Id.*)  The ALJ

asked if that hypothetical individual could perform Plaintiff's past work.  (*Id.*)  The VE opined that

the hypothetical person could not perform the past work.  (*Id.*)

The ALJ then asked the VE if there were any jobs the hypothetical person could perform.

(R. at 170.)   The VE opined that the hypothetical person could perform the job of cleaner,

13

housekeeper (323.687-014, light, unskilled, SVP: 2) with 10,500 jobs in the state and 123,600 nationally; poultry dresser (525.687-070, light, unskilled, SVP: 2) with 1,000 in the state and 7,700 nationally; and bakery worker, conveyer line (524.687-022, light, unskilled, SVP: 2) with 1,000 in the state and 10,600 nationally. (R. at 170-71.) Upon questioning by the ALJ, the VE testified that his testimony did not conflict with the Dictionary of Occupational Titles (DOT). (R. at 171.) The VE further testified that his testimony regarding type and extent of contact with others was not included in the DOT, but that his testimony was based on his professional opinion. (*Id.*)

In response to a question by the ALJ, the VE testified that all three positions have production requirements to maintain employment. (*Id.*) The attorney then asked the VE whether "wander[ing] off" from the job, failing to complete some tasks, or needing to have the same things explained every time would impact the hypothetical person's ability to perform competitive employment. (R. at 172.) The VE responded that a person who lost 15 percent of the workweek or 10 minutes per hour would not maintain competitive work. (*Id.*) The VE also testified that the need for repeated instruction would result in reprimand, probation, and dismissal. (R. at 172-73.) In response to another question by the attorney, the VE testified that a physical or extremely abusive verbal altercation between an employee and employer would result in immediate dismissal, and that lesser altercations would result in a reprimand, probation, or dismissal if not resolved in anywhere from 30 to 90 days. (R. at 175.)

### 4.    March 28, 2014 Hearing Testimony

On March 28, 2014, Dr. Fletcher, Patsy Dodi King, and Velma Floyd testified at a second hearing before the ALJ. (R. at 182-215.)

14

### a.    *Barbara Susanne Fletcher, Psy.D.'s Testimony*

Dr. Fletcher, a medical expert, testified regarding her impressions and conclusions of Plaintiff's medical condition.  (R. at 185.)  Plaintiff had an anti-social personality disorder, an anxiety disorder, and a history of substance abuse that caused some residual problems.  (R. at 186, 193.)  She opined that Plaintiff might be able to function socially for short periods of time, but she did not think he could maintain it if he did.  (R. at 194.)  She disagreed with the schizoaffective and bipolar diagnoses.  (R. at 187.)  She explained that the schizoaffective disorder diagnosis was inaccurate because "there's nothing documented anywhere to support" the diagnosis.  (R. at 191)

In response to a question by the attorney, Dr. Fletcher testified that Plaintiff's limitations on social function were moderate, but not severe.  (R. at 188-89.)  She explained that she was limited in her ability to opine on the degree of interference with concentration, persistence, and pace because she felt that Plaintiff's testing was not valid.  (R. at 189-90, 194-95.)  Additionally, Plaintiff did not cooperate during testing.  (R. at 189-90, 194-95.)  She further explained that "[w]ith this type of personality disorder a person can be extremely manipulative, and they can be quite good at manipulating their environment, and he could possibly manipulate the testing."  (R. at 190.)  Dr. Fletcher then opined that Plaintiff's actions suggested poor coping skills.  (*See* R. at 195.)

The ALJ then asked Dr. Fletcher whether she would be more confident in her opinion concerning Plaintiff's limitations and social functioning if he had cooperated with the testing.  (R. at 194.)  Dr. Fletcher responded that she would not because her opinion was based on her review of the record, and Plaintiff's actions during testing only solidified her opinion.  (R. at 194-95.)

In response to questions by the attorney and the ALJ, Dr. Fletcher testified that she did not know if Plaintiff could function on a full-time basis in a job.  (R. at 195.)  Plaintiff's performance

would depend on his motivation, including his motivation to keep the job and his reward for the job. (R. at 196-97.)

The attorney then asked Dr. Fletcher whether auditory and visual hallucinations were consistent with a schizoaffective disorder diagnosis. (R. at 199.) She responded that it could be consistent. (*Id.*) The attorney then asked whether an individual sitting at a window and watching, expressing fear that someone was out to get them, or the need to be forced to take a bath, were symptoms of an anti-social personality. (R. at 200.) Dr. Fletcher responded, "no, that is not." (*Id.*) The attorney then asked if they could be symptoms of anxiety. (*Id.*) Dr. Fletcher testified that they could be anxiety or depression. (*Id.*) Dr. Fletcher then testified that there was crossover of symptoms between conditions, so periodic hallucinations could be related to Plaintiff's anxiety or his depression. (R. at 200-01.) She further testified that it could also be related to an anti-social personality disorder. (*See* R. at 201.)

### b.    *Patsy Dodi King's Testimony*

Patsy Dodi King testified that she was Plaintiff's aunt, that she saw him approximately three to four times a week, and that she sometimes took him on trips from his parent's house. (R. at 205.) She testified that in earlier years Plaintiff was very active and liked to talk and party. (R. at 207.) Over the past two years, he had not been the same, and he just sat and stared. (*Id.*) Plaintiff had stated that people were after him and asked if they were going to hurt him. (*Id.*)

### c.    *Velma Floyd's Testimony*

Velma Floyd testified that she was "real close friends with the family," had known Plaintiff since high school, and "used to date [Plaintiff] back in the days." (R. at 210.) She helped Plaintiff's mother care for him. (R. at 211.) Plaintiff acted like "a little boy," would just sit and stare when

they were alone, and "always" stated that someone is after him.  (R. at 212.)  Ms. Floyd also went

with Plaintiff to some of his appointments at MetroCare.  (R. at 214.)

## C.      The ALJ's Findings

The ALJ issued his decision denying benefits on May 30, 2014.  (R. at 17-27.)  At step one,[4]

he found that Plaintiff had not engaged in substantial gainful activity since July 22, 2011, the

application date.  (R. at 19.)  At step two, he found that Plaintiff had the severe impairment of

personality disorder.  (*Id.*)  Despite that impairment, at step three, he found that Plaintiff had no

impairment or combination of impairments that met or equaled the severity of one of the

impairments listed in the social security regulations.  (*Id.*)

Before proceeding to step four, the ALJ determined that Plaintiff had the RFC to perform

a full range of work at all exertional levels, and the mental capacity to perform work where

interpersonal contact is only incidental to the work.  (R. at 20.)  The ALJ defined "incidental" as

meaning that Plaintiff could work in proximity with others, but the accomplishment of his tasks

could not be dependent on a close working relationships with the people around him.  (*Id.*)

At step four, the ALJ found that Plaintiff had no past relevant work.  (R. at 25.)  At step five,

he found that transferability of job skills was not an issue because Plaintiff did not have any past

relevant work, but considering his age, education, work experience, and RFC, there were jobs that

existed in significant numbers in the national economy that Plaintiff could perform. (*Id.*)

Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the

Social Security Act, since July 22, 2011, the date the application was filed.  (R. at 26.)

---

[4] A five-step analysis is used to determine whether a claimant is disabled under the Social Security Act, which is
described more fully below.

17

## II.   ANALYSIS

### A.   Legal Standards

#### 1.   Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g).  "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance."  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present.  *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program.  *Davis v. Heckler*, 759 F.2d 432, 435 n.1 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income.  *Id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision.  *Id.* at 436 and n.1.

## 2.       Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act.  *Leggett*, 67 F.3d at 563-64.  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status."  *Anthony*, 954 F.2d at 295.  An "impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability."  *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1.      An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.      An individual who does not have a "severe impairment" will not be found to be disabled.

3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.      If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)

(currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)).  Under the first four steps of the analysis, the

burden lies with the claimant to prove disability.  *Leggett*, 67 F.3d at 564.  The analysis terminates

if the Commissioner determines at any point during the first four steps that the claimant is disabled

or is not disabled.  *Id*.  Once the claimant satisfies his or her burden under the first four steps, the

burden shifts to the Commissioner at step five to show that there is other gainful employment

available in the national economy that the claimant is capable of performing.  *Greenspan*, 38 F.3d

at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of

the regulations or by expert vocational testimony or other similar evidence.  *Fraga v. Bowen*, 810

F.2d 1296, 1304 (5th Cir. 1987).  After the Commissioner fulfills this burden, the burden shifts back

to the claimant to show that he cannot perform the alternate work.  *Perez v. Barnhart*, 415 F.3d 457,

461 (5th Cir. 2005).  "A finding that a claimant is disabled or is not disabled at any point in the five-

step review is conclusive and terminates the analysis."  *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir.

1987).

**B.**     **Issues for Review**

Plaintiff raises three issues for review:

1.    The regulations set forth a special technique to evaluate mental impairments
      that must be used to determine if an individual has a severe mental
      impairment at Step 2. [Plaintiff's] treating psychiatrist diagnosed him with
      schizoaffective disorder. The [ALC] found only [Plaintiff's] personality
      disorder severe, and failed to rate the severity of his affective disorder under
      20 C.F.R. § 416.920a. Was the ALJ's decision legally sufficient if he did not
      follow the regulatory scheme?

2.    The Commissioner—in determining [Plaintiff's] [RFC]—must examine
      relevant medical evidence and articulate a satisfactory explanation for her
      actions, including a rational connection between the facts found and the
      choices made. The [ALJ] found [Plaintiff] could perform work where
      interpersonal contact is only incidental to the work performed. None of the
      treating, examining, or reviewing psychiatrists and psychologists agreed with

that limitation. Was the RFC supported by substantial evidence in light of this fact?

3.     The regulations and rulings provide that a claimant's residual functional includes consideration of both the side-effects of medications. [Plaintiff] reported significant daytime somnolence to his treating sources. They believed the sedation effect was from his medications and attempted to adjust the dosages. Was the ALJ's RFC supported by substantial evidence, if the ALJ failed to acknowledge and evaluate the side-effects of [Plaintiff's] medications?

(doc. 22 at 9-10.)

## C.     Severity of Plaintiff's Mental Impairment

Plaintiff first contends that the ALJ erred in finding that a personality disorder was his only severe impairment and by not rating the severity of his schizoaffective disorder under 20 C.F.R. § 416.920a before proceeding to the next step.  (doc. 22 at 27.)

At step two of the sequential evaluation process, the ALJ "must consider the medical severity of [the claimant's] impairments."  20 C.F.R. § 404.1520(a)(4)(ii),(c) (2012).  To comply with this regulation, the ALJ "must determine whether any identified impairments are 'severe' or 'not severe.'"  *Herrera v. Comm'r of Soc. Sec.*, 406 F. App'x 899, 903 (5th Cir. 2010) (per curiam).  Under the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  The Fifth Circuit has held that a literal application of this regulation would be inconsistent with the Social Security Act because the regulation includes fewer conditions than indicated by the statute.  *Stone v. Heckler*, 752 F.2d 1099, 1104-05 (5th Cir. 1985).  Accordingly, in the Fifth Circuit, an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work."  *Id.* at 1101.  In other words, "the claimant need only . . . make a *de*

*minimis* showing that her impairment is severe enough to interfere with her ability to do work."
*Anthony v. Sullivan*, 954 F.2d 289, 294 n.5 (5th Cir. 1992) (citation omitted).  When determining
whether a claimant's impairments are severe, an ALJ is required to consider the combined effects
of all physical and mental impairments regardless of whether any impairment, considered alone,
would be of sufficient severity.  *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) (citing 20 C.F .R.
§ 404.1523) (finding that an ALJ is required to consider the combined effects of all physical and
mental impairments regardless of whether any impairment, considered alone, would be of sufficient
severity).  The claimant has the burden to establish that his impairments are severe.  *See Bowen v.
Yukert*, 482 U.S. 137, 146 n.5 (1987).

Plaintiff contends that the ALJ should have included his schizoaffective disorder as a severe
impairment.  (doc. 22 at 28.)  He argues that Dr. Luszczynska diagnosed him with a bipolar disorder
with psychotic features in 2009, which was changed to a schizoaffective disorder in 2012, and that
the SAMCs diagnosed him with a schizoaffective disorder as well, but the ALJ relied on the
diagnosis of Dr. Fletcher without explanation.  (*Id.* at 30-32.)  The Commissioner responds that the
ALJ properly considered the appropriate medical evidence, found that Plaintiff's personality
disorder was a severe mental impairment, considered the paragraph B criteria for his personality
disorder, and then proceeded beyond step two.  (*See* doc. 23 at 4.)  Because the ALJ proceeded
beyond step two, Plaintiff cannot demonstrate prejudice even if the schizoaffective disorder should
have been considered at step two.  (*See id.*)

In this case, the ALJ did not explain why he only found a personality disorder as Plaintiff's
only severe impairment at step two.  (*See* R. at 19-20.)  The ALJ proceeded beyond step two,
however.  (R. at 20-25.)  In determining Plaintiff's RFC, the ALJ considered all of the medical

evidence, including his evidence of a schizoaffective disorder.  (*See* R. at 20-25.)  The Fifth Circuit

has stated that a failure to make a severity finding at step two is not reversible error when an ALJ

continues with the sequential evaluation process.  *Herrera*, 406 F. App'x at 903 (citing *Adams v.*

*Bowen*, 833 F.2d 509, 512 (5th Cir. 1987) (noting the ALJ's failure to make a severity finding at step

two was not a basis for remand where the ALJ proceeded to later steps of the analysis); *Mays v.*

*Bowen*, 837 F.2d 1362, 1365 (5th Cir. 1988) (per curiam) ("[I]f the ALJ proceeds past the

impairment step in the sequential evaluation process the court must infer that a severe impairment

was found.")).  Accordingly, even if the ALJ erred by finding that Plaintiff's only severe medical

impairment was a personality disorder, the error is harmless because he proceeded beyond step two.

## D.   Residual Functional Capacity

Plaintiff next argues that the ALJ's RFC assessment is not supported by substantial

evidence.[5]  (doc. 22 at 33-42.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite

recognized limitations.  20 C.F.R. § 404.1545(a)(1) (2012).  It "is an assessment of an individual's

ability to do sustained work-related physical and mental activities in a work setting on a regular and

continuing basis."  Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2,

1996).  An individual's RFC should be based on all of the relevant evidence in the case record,

including opinions submitted by treating physicians or other acceptable medical sources.  20 C.F.R.

§ 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.

### 1.   Lay Opinion

Plaintiff contends that the ALJ improperly relied on his own lay opinion to determine the

effects of his mental impairments in violation of *Ripley v. Chater*, 67 F.3d 552 (5th Cir. 1995) (doc.

---

[5]  Issues two and three both relate to the ALJ's RFC determinations, so they will be considered together.

22 at 35.)

In *Ripley*, the claimant argued that the ALJ failed to develop the record fully and fairly by finding that he could perform sedentary work even though there was no medical testimony to support that conclusion. *Ripley*, 67 F.3d at 557. The Fifth Circuit noted that although an ALJ should usually request a medical source statement describing the types of work that the applicant was still capable of performing," the absence of such a statement did not necessarily make the record incomplete. *Id.* Rather, the court had to consider whether there was substantial evidence in the record to support the ALJ's decision. *Id.* The record contained "a vast amount of medical evidence" establishing that the claimant had a back problem, but it did not clearly establish the effect of that problem on his ability to work. *Id.* The ALJ's RFC determination was therefore not supported by substantial evidence, so the Fifth Circuit remanded the case with instructions to the ALJ to obtain a report from a treating physician. *Id.* at 557-58. Notably, the Fifth Circuit rejected the Commissioner's argument that the medical evidence discussing the extent of the claimant's impairment substantially supported the ALJ's RFC assessment, finding that it was unable to determine the effects of the claimant's condition on his ability to work absent reports from qualified medical experts. *Id.* at 558 n.27.

Here, the ALJ gave little weight to Drs. Crumley's and Luszcynska's assessments, and no weight to Dr. Campa's assessment in determining the RFC. (R. at 22.) In expressing his reason for giving their assessments little or no weight, the ALJ explained that the doctors relied on Plaintiff's subjective complaints, to which he gave "little weight in light of his manipulations." (*See* R. at 22, 25.) The ALJ appeared to give great weight to the opinions of consultative examiner Dr. Fletcher's report and her testimony at the second hearing, which he found to be consistent with the longitudinal

record.  (*See* R. at 22, 24-25.)  He then carefully considered Dr. Fletcher's medical opinions and the testimony of Plaintiff's witnesses from the two hearings, and found that Plaintiff had the RFC to perform a full range of work at all exertional levels and a mental capacity to perform work where interpersonal contact was only incidental to the work performed.  (R. at 20, 23-25.)  Because the ALJ relied on the medical opinions of Dr. Fletcher to determine Plaintiff's limitations, he did not independently decide the effects of Plaintiff's impairments.  *See cf. Johns v. Colvin*, No. 3:13-CV-4420-N-BH, 2015 WL 1428535, at *18-20 (N.D. Tex. Mar. 30, 2015) (finding a *Ripley* error where there were no medical opinions regarding the effects the claimant's impairments).  Accordingly, the ALJ did violate *Ripley*, and remand is not required on this basis.

###   2.   *Plaintiff's limitations*

Plaintiff next contends that the medical opinion evidence does not support the ALJ's finding that he was capable of work where interpersonal contact was only incidental to work performed. (doc. 22 at 33.)

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).  The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists.  *See* SSR 96-8p, 1996 WL 374184, at *1.  The ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision, or all the evidence that he rejected.  *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994).  A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if it would reach a different conclusion

25

based on the evidence in the record. *Leggett*, 67 F.3d at 564.

Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted).  A reviewing court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.*  Courts may not reweigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *Johnson*, 864 F.2d at 343 (citations omitted).

Here, after making a credibility finding regarding Plaintiff's alleged symptoms and limitations and "careful consideration of the entire record," the ALJ determined that Plaintiff had the RFC to perform a full range of work at all exertional levels and a mental capacity to perform work where interpersonal contact was only incidental to the work performed.  (R. at 20.)  The ALJ then explained that the term "incidental" was defined to mean that the Plaintiff could work in proximity to others, but the accomplishment of his tasks was not dependant on a close working relationship with the people around him.  (*Id.*)

In considering the Plaintiff's symptoms, the ALJ followed a two-step process. (R. at 20-21.) First, the ALJ determined whether there was an underlying medically determinable physical or mental impairment, or combination thereof, that could reasonably be expected to produce Plaintiff's pain or other symptoms. (*Id.*)  At this first step, the ALJ found that the Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (*Id.*) Second, the ALJ evaluated the intensity, persistence, and limiting effects of Plaintiff's symptoms

to determine the extent to which they limited his functioning, and found the "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (R. at 21.)

In reaching his determination, the ALJ noted multiple reasons for giving little or no weight to some of the doctors' medical opinions, including the lack of explanation, reliance on subjective complaints, inconsistencies, and the impact of social and economic factors. (*See* R. at 20-25.) The ALJ also considered in detail the opinions and testimony of Dr. Fletcher, especially regarding Plaintiff's motivation. (*See* R. at 22-23.) As the trier of fact, the ALJ was entitled to weigh the evidence against other objective findings, including the opinion evidence available, and the record as a whole.

As discussed, the ALJ's RFC assessment should be based on all of the relevant evidence in the record and should account for all of the claimant's impairments, including those that are non-severe. *See* 20 C.F.R. § 404.1545(a)(3). The ALJ's determination necessarily includes an assessment of the nature and extent of a claimant's limitations and determines what the claimant can do "on a regular and continuing basis." 20 C.F.R. §§ 404.1545(b)-(c), 416.945(b)-(c); SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996); *accord Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) ("Both [20 C.F.R. § 404.1545 (2002) and SSR 96–8p (1996)] make clear that RFC is a measure of the claimant's capacity to perform work 'on a regular and continuing basis.' "). SSR 96-8p distinguished between what the ALJ must consider and what the ALJ must include in her written decision. The ALJ's narrative discussion shows he applied the correct legal standards and considered all of the relevant evidence in determining Plaintiff's RFC.

Plaintiff disagrees with the ALJ's conclusions regarding Dr. Fletcher's medical opinions and

27

testimony, and his findings regarding Plaintiff's limitations.  (doc. 22 at 38.)  As noted, the ALJ carefully considered Plaintiff's entire medical record; the provided medical opinions and assessments; and the testimony at both hearings.  (*See* R. at 20-25.)  In reaching his determination, the ALJ noted multiple reasons for giving little or no weight to some of the doctors' medical opinions, including the lack of explanation, reliance on subjective complaints, inconsistencies, and the impact of social and economic factors.  (*See* R. at 20-25.)  The ALJ then noted that "[b]ased on [Dr. Fletcher's] testimony, and the longitudinal record of mild to moderate functional limitations cited by Metrocare and the absence of functional limitations during his incarceration, the evidence does not establish limitations in concentration, persistence and pace, activities of daily living or deterioration, and the claimant would be able to perform work requiring routine changes with only incidental contact if he was motivated to engage in such work."  (R. at 23) (internal citation omitted).  Accordingly, the ALJ found Plaintiff was "capable of engaging in activities that he calculates are worth his effort."  (*Id.*)

Even if Plaintiff disagrees with Dr. Fletcher's opinions and would have preferred that the ALJ give more weight to the medical opinions of other doctors in determining Plaintiff's RFC, "the ALJ [was] free to reject the opinion of any physician when the evidence support[ed] a contrary conclusion."  *Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981).  Moreover, a reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record.  *Leggett*, 67 F.3d at 564. Accordingly, the ALJ's RFC assessment was supported by substantial evidence.

### 3.   *Medication Side Effects*

Plaintiff argues the ALJ failed to consider the side effects of his medication, Risperdal, in

making his disability determination, which resulted in an inaccurate RFC assessment.  (doc. 22 at 40.)

> ### a.     Risperdal

As part of the disability determination, the ALJ is required to consider "the type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [] ain or other symptoms." *Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999) (alterations in original) (citing 20 C.F.R. § 404.1539(c) (3)(iv)); *see also* SSR 96–7p.  Social Security Regulation 96–8p also directs that "the RFC assessment must be based on all of the relevant evidence in the case record, including the effects of treatment and the limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." *Brown v. Barnhart*, 285 F. Supp. 2d 919, 935 (S.D. Tex. 2003) (internal quotation marks omitted). Consequently, when a claimant complains of medication side effects, and the ALJ fails to evaluate those side effects and their impact on the claimant's RFC, the ALJ commits error.  *Id.*

Here, Plaintiff testified at the hearing before the ALJ that his medication makes him feel "medicated" and "nervous."  (R. at 138.)  He and other witnesses then testified about Plaintiff's forgetfulness and inability to complete tasks/projects.  (*See* R. at 143, 148, 150.)  Although the ALJ's decision generally noted Plaintiff's medication, it made no specific finding regarding his asserted forgetfulness when taking his medications.  (R. at 17-27.)  "The lack of [a] finding makes it impossible to determine whether the ALJ properly considered the side effects." *Jarrett v. Colvin*, No. 3:12-CV-4044-BH, 2014 WL 1281293, at *13 (N.D. Tex. Mar. 31, 2014) (citing *Harrison v. Colvin*, No. 3:13-CV-2851-D, 2014 WL 982843, at *12 (N.D. Tex. Mar. 12, 2014) ("Without a specific finding regarding [Plaintiff's] subjective complaints about [the side effects], the court

cannot determine whether the ALJ properly considered the side effects of [Plaintiff's] pain medication in making his RFC determination.")).  The Commissioner agrees that "[t]he ALJ did not mention the alleged side effects of Plaintiff's medications" in his decision.  (doc. 23 at 10.) Accordingly, the ALJ committed error by failing to make specific findings on the side effects of Plaintiff medications.  *See Tims v. Astrue*, No. G-09-1842, 2010 WL 3359475, at *7 (S.D. Tex. Aug. 24, 2010) ("[T]he ALJ failed to analyze the side effects of medications and/or the impact of such side effects on [Plaintiff's] ability to maintain competitive employment.")

> ### b.    *Harmless Error*

The Court must still consider whether the ALJ's failure to properly evaluate the side effects of his medication was harmless.  *See Harrison*, 2014 WL 982843, at *13 (applying harmless error analysis to the ALJ's failure to properly evaluate the side effects of medication); *Jarrett*, 2014 WL 1281293, at *13 (same).  In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error.  *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)).

Here, consideration of the alleged side effect of Risperdal, i.e., forgetfulness, in light of the record could have affected the ALJ's RFC determination.  A different RFC finding could have changed the outcome of this case.  *Harrison*, 2014 WL 982843, at * 13 (citing to *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988)) ("Had the ALJ considered [the side effects] and found it to be credible, such finding could affect [Plaintiff's] RFC and, ultimately, the ALJ's decision regarding whether [Plaintiff] was disabled as defined under the Act.").  Because it is not inconceivable that a different disability determination would have been reached, *see Bornette*, 466 F. Supp. 2d at 816,

the ALJ's error was not harmless and requires remand, *see Jarrett*, 2014 WL 1281293, at *13-14 (finding that the ALJ's failure to make findings regarding the side effects of claimant's medication was not harmless error and remand was required).

### III.  RECOMMENDATION

The Commissioner's decision should be **REVERSED**, and the case should be **REMANDED** for further administrative proceedings.

**SO RECOMMENDED** this 13th day of February, 2017.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

### INSTRUCTIONS FOR SERVICE AND
### NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

31